PASSAIC COUNTY COURT OF COMMON PLEAS.

MAX BALASH, PETITIONER-APPELLEE, v. GERA MILLS, RESPONDENT-APPELLANT.

Decided January 4, 1945.

For the petitioner-appellee, *Nathan Rabinowitz* and *Isadore Rabinowitz.*

For the respondent-appellant, *Edwin Joseph O'Brien.*

DELANEY, C. P. J.   Max Balash sought compensation for temporary and permanent disability alleged to have resulted from an accident occurring on August 31st, 1942, out of and in the course of his employment by Gera Mills, a manufacturer of woolen textiles.   He prevailed in the Workmen's Compensation Bureau, and from the judgment entered on the determination of facts and rule for judgment his employer appealed.

Balash was one of eight men, including a foreman, employed at the time in question by the woolen manufacturer as "final examiners."   They made the last inspection of the finished cloth, which thereafter passed into the "merchandise department."   Equipped with "spickers" needles and scissors, they explored the fabrics, both front and back, for every sort of flaw and imperfection resulting from the processes of spinning or of weaving, for marks, and also for the proper width and feel.   If the goods were found to be too hard or of improper width, they returned them to steaming machines for correction; but otherwise they set down on the several lines of a tag affixed to the piece, a report of their findings, folded the cloth, raised it upon their right shoulders, and carried it to a truck which, when filled, was drawn or pushed to an elevator and then moved to another floor.   When examining the cloth, each workman apparently stood by his own table, on the flat surface of which the piece was pulled down from a roll on a movable stand and minutely inspected.

The cloth examined varied from time to time in weight, sometimes being heavier, and again lighter, than the average. The material under examination on August 31st, 1942, was "Government" or "Khaki" serge, running fifty-five, sixty, and sixty-five yards in length—the average piece being sixty yards—and nearly, if not quite, two yards in width, weighing fourteen ounces to the yard, the weight of a piece of average length being somewhat over fifty pounds.

The examiners worked in a large room, described as being over thirty yards in length, in which stood the steaming machines and "a very big pressing machine," and in which

the temperature, usually warmer than out-of-doors, sometimes rose to a hundred degrees and over. Their hours of work ran from eight o'clock in the morning until half past four in the afternoon, with a thirty-minute intermission for lunch at noon. Their work, it is apparent, was specialized, and the workers were experienced. Balash had been employed in it for Gera Mills for seven years, and for an earlier employer twenty years. The foreman, Zalenke, had held his job for thirty years, and another examiner, Ruttger, twelve years. Their tables were placed where the northern light fell upon them. It seems to have been exacting work in which they were engaged, calling for close application. They examined fifty or fifty-five pieces a day, about half of them in the forenoon.

At noon on the day in question, when a bell announced the recess period, each examiner, in accordance with his daily custom, ceased his work, left the cloth lying upon his table without regard to how far his inspection of it had advanced, and ate his lunch at his own table. When at half past twelve the bell again rang, all of them, except Ruttger, who appears to have left his table, at once commenced to work—the promptitude with which they resumed their tasks turning, we gather from the testimony of the foreman, on the volume or urgency of the work.

Not long afterward—the foreman estimates about five, ten, or fifteen minutes, and Ruttger "a few minutes," after half past twelve; "I would say near twenty-five to one"—when all the examiners, save Ruttger, were again busied in their work, Balash concededly suffered a coronary thrombosis, from which admittedly came the disability, temporary and permanent, for which he made claim.

He testified that when the bell sounded at noon he had finished the actual examination of a piece, "but I didn't mark on the back and the result on the ticket. I stopped because the bell was ringing for lunch." He testified further that he left the cloth lying folded upon his table, and that right after half past twelve he made the markings on the ticket, raised and shouldered the piece, and thereupon felt extreme pain in the upper left shoulder area in his back and in his

chest, began to sweat and feel faint and dizzy, and being unable to throw the cloth upon the truck, managed at length to push it onto the truck from his table.

He called the attention of the foreman to his state, or the foreman perceived the man's pallor and perspiration, and summoning Ruttger, who then had got back to his table, directed him to take Balash to a nurse in another building.

At the hearing in the Workmen's Compensation Bureau and, of course, here on appeal, counsel for the parties have restricted the subject of controversy to a single question: Was the coronary occlusion the result solely of the natural progress of disease, or did exertion either cause or precipitate it? It was granted, for the purposes of this proceeding, that physical effort—and the very exertion which Balash underwent in raising fifty pounds of cloth to his shoulder, if, in fact, he lifted it there—may cause, or accelerate and so contribute to, a coronary thrombosis in a man who, like Balash, was then in his sixty-fourth year, and suffering from a preexisting coronary sclerosis. It is undisputed that the thrombosis occurred "in the course of his employment;" but his employer's position is that Balash was stricken during the lunch period and did not afterward resume work, and sustained no "accident" and suffered nothing arising "out of" his employment.

It is properly conceded in the brief for the employer that disability resulting from coronary occlusion occasioned by exertion, strain, or trauma, is compensable in this state, in those instances in which the exertion, strain, or trauma arose out of and in the course of the claimant's employment.

It is the established law also that an accidental strain upon the heart, even though it was previously weakened by disease, may be a compensable injury, under our statute, where the accident arose out of and in the course of the employment. *Hentz* v. *Janssen Dairy Corp.*, 122 *N. J. L.* 494, 508; 6 *Atl. Rep.* (*2d*) 409.

The benefits of our act (*N. J. S. A.* 34:15–1, *et seq.*) are not limited to those who suffer no previous physical impairment. *Molner* v. *American Smelting and Refining Co.* (*Court of Errors and Appeals*), 128 *N. J. L.* 11; 24

*Atl. Rep. (2d)* 392; *Bernstein Furniture Co.* v. *Kelly*, 114 *N. J. L.* 500; 177 *Atl. Rep.* 554.

The central question in the matter is one of fact. The burden of proof is, of course, upon the claimant. *Armstrong* v. *Union County Trust Co.*, 14 *N. J. Mis. R.* 648; 186 *Atl. Rep.* 522; affirmed by the Court of Errors and Appeals, 117 *N. J. L.* 423; 189 *Atl. Rep.* 138.

The presumption is that a coronary thrombosis "was due solely to disease; and the *onus* is on claimant to establish that the asserted accident was at least a contributory cause without which the occlusion would not have occurred." *Schlegel* v. *H. Baron & Co.*, 130 *N. J. L.* 611; 34 *Atl. Rep.* (2d) 132.

The court must be satisfied "that but for the employment" the injury "would not have occurred when it did." *Ciocca* v. *National Sugar Refining Company of New Jersey*, 124 *N. J. L.* 329; 12 *Atl. Rep.* (2d) 130.

No one testified that he actually saw Balash hoist the piece to his shoulder. Across each table was hung a black curtain, "on account you shouldn't see anything else only the goods." Whether the curtains were of such dimensions or were so placed as to amount to screens shutting off one examiner's view of another, is not determinable from the record. In any case, the foreman, when asked whether any other man in the group knew at the time that Balash had become ill, said that he did not think so.

The eight tables stood, as we understand it, in a single row, each table being about two feet apart from the next; but the work of the examiners was engrossing, and it appears that they had earnestly addressed themselves to it. After the lunch period they "started," in the words of their foreman, "working, pulling these pieces like anything." The raising of a piece of goods from the table to the shoulder and the placing of it upon one of the trucks entailed routine movement, to which all the men were accustomed, and were movements which each of them made day in and day out, as many times a day as the number of pieces he examined, and each man, without assistance from any other, bore his own goods to the truck, except, perhaps, when the cloth weighed in

excess of a hundred pounds to the piece. The fact is that there is nothing in the evidence that indicated any of the five examiners noticed that the foreman and Balash were talking together, or that Balash and Ruttger, at the direction of the foreman, left the room in which they were working.

Zalenke, the foreman—watchful and cautious—was wont to send his men to the plant hospital on slight occasion, "even if anybody scratch his finger, I say take him right away to the nurse." The testimony of this witness required close reading, his sentences often being strange in structure, and one sentence sometimes running into another. But that he was intent only on telling the very truth we have no doubt. Only he and Ruttger were sworn for the petitioner, who, of course, testified for himself.

Statements in the handwriting of a representative of an insurance company, taken and witnessed by him on October 8th, 1942, and signed by the five remaining examiners, were offered by the respondent and were admitted, without objection by counsel for the claimant, in evidence. These statements consist merely of a few lines, in substantially the same words, and all run to the like effect, namely, that Balash never spoke to them of any accident occurring to himself or complained to them of being unwell. Neither Balash nor anyone on his behalf claimed differently.

Although, as is now known, Balash had pre-existing coronary sclerosis, he had no disabling sickness before August 31st, 1944, but had worked for years theretofore, day after day. He was a steady, a good, and a rapid worker, according to the pronouncement of the foreman, and there is no evidence to the contrary.

On one occasion, about two weeks before the day in question, as Balash himself placed it, or "sometime in the latter part of August," as the foreman said, Balash complained at half past three or four o'clock in the afternoon of an upset stomach and headache. The foreman advised him to rest, and he did until four-thirty—the quitting hour—and the foreman said, "The following day he came in to work and he worked as though he had never even felt ill the previous day."

No one appears to have seen Balash, we repeat, lift the goods to his shoulder, and yet his testimony that he did is not without corroboration. Zalenke said, in effect, and with characteristic oddity of phrase, that cloth commonly lay upon the examining tables throughout the half-hour lunch period; and it is hard to see how it could be otherwise. The pieces of goods of the same material and construction, as we have seen, were not of uniform length, but varied sometimes by five yards and again by ten, and we suppose it would be a feat for an examiner so to time his work, even if there should be any advantage or point in achieving it, that the completion of his inspection of a piece, including his marking of its ticket, and the striking of the bell at twelve o'clock, should occur simultaneously, or practically simultaneously.

That such occurrence of the two incidents occasionally happened may be assumed; that they happened with comparative infrequency may, we think also, and with equal safety, be assumed.

The foreman testified that after he became aware that Balash was visibly sick, or after he had sent him, with Ruttger, to the nurse, he noticed Balash's cloth upon the truck; and he said that Balash must have put it there, each examiner, according to the system in the department, removing his own goods. After lunch "he had a piece to finish; he finished it, because I saw it on the truck, so he must have lifted it on the truck." In answer to a direct question, "Did you see a piece on Mr. Balash's table?" he replied, "I think there was a piece on the table."

Respondent's theory is that Balash was stricken in the course of the lunch period. Its theory is supported by no direct testimony or statement, except a statement written out by the insurance company's investigator and signed by the foreman on October 8th, 1942, on the same occasion as the statements hereinbefore mentioned were obtained from the other examiners. So far as pertinent to the respondent's theory, it ran: "The next time my attention was attracted to Max Balash was on Monday, August 31st, 1942, during our regular lunch period, between twelve noon and twelve-thirty P. M., while all the examiners and I were sitting eating our

lunch at the examining tables in our department, when Balash told me he had just that moment felt pain in his chest and back and that he felt cold. Balash said he had first felt the pain in his chest while he was eating with us. He did not say anything about his work. He did not tell me about any fall or anything unusual. At about twelve-thirty P. M., August 31st, 1942 (immediately after Balash told me he felt a pain in his chest) I sent Balash to the mill hospital with Fred Rodgers, one of the other examiners." By "Fred Rodgers," Fred Ruttger was meant.

This statement was probably epitomized by the person in whose lay hand it was set down; it contains words not likely to have been used by Zalenke, but the latter subscribed it and it requires our attention.

At a hearing in the Workmen's Compensation Bureau, Zalenke said that it was five, ten, or fifteen minutes after half past twelve when he first learned that Balash had become ill; and when, on cross-examination, the above-quoted statement was read to him, he emphatically corrects it—it was not during lunch hour when Balash told him that he was in pain. "No, because when we are eating our lunch I am very far away from him, I am just four tables away from him, so after the lunch, after dinner, about that time;" and on this point he stood steadfast and unshaken.

That each examiner ate lunch at his own working table was unquestioned. That during lunch time Balash arose, left his table, and walked to or approached that of the foreman, was claimed by no one. If during that half hour Balash had complained of distress to Zalenke, "four tables away," it is curious that the other examiners should have said five weeks later that Balash had never spoken of being unwell. It is true that each of them said that Balash had never told "me" that he was ill; but if Balash had complained in their hearing at all, there is no probability that not one, but five or six of them should have quibbled about it merely because he was not personally addressed. The examination and cross-examination of the foreman occurred on December 29th, 1943. The hearing was continued on that day to January 12th, 1944.

On January 12th respondent called four witnesses, and if there was evidence (other than Zalenke's statement of October 8th, 1944) that the claimant had complained to anyone between noon and twelve-thirty on the day in question, there was opportunity to have produced it. What respondent then actually produced, apart from the testimony of physicians and nurses, was the signed statements, heretofore mentioned, of examiners who, in the words of respondent's counsel, "worked on both sides of the petitioner," all of whom said they had heard no complaint. We cannot escape the conclusion that Zalenke was inattentive to what he signed in October, 1942, or that he and his interviewer misunderstood one another.

One of the two nurses in respondent's employ testified that Balash's "case card" stated "12:35" as the time when Balash entered the mill hospital. Perhaps it was never intended to state anything closer than the conjectural or approximate time. If, according to all the evidence on the point, Ruttger, holding Balash by the arm, started away some appreciable time after half past twelve—at 12:35, or a few moments earlier or five or ten minutes later—the card is clearly inaccurate. They worked on the third floor of a building, which was said to be equipped with an elevator, but which elevator they did not take; but walked down "more than one flight of stairs" and paused "a few minutes" on the way down because Balash, "very weak" and with pain in his chest and back, asked for rest. The hospital was on the second floor of another building, without an elevator, and distant "an eighth of a mile," according to the estimate of the junior nurse, from the first. It is manifest that the card, made up in some other department, from memoranda set down by the nurses on "a scrap of paper," throws no light on the question whether Balash was stricken while raising a piece of goods to his shoulder after the lunch hour, as he testified, or during the lunch period, as respondent contends.

Respondent chiefly relies upon the circumstances, as claimed by it, that Balash did not at once associate his seizure with his alleged raising of the goods and speak about it to his foreman, to Ruttger, to the nurses. He said he did tell the

foreman and a nurse, but they said he did not; and we think it highly probable that they are right. He was indisputably very ill and weak and in acute pain at the time—so stricken that he was confined to bed for three months—and his recollection of what he said, recalled sixteen and a half months afterwards, may well have been faulty and mistaken. But after having been detained "about half an hour," according to the senior nurse, he was removed to his house and bed and the attention of a physician; and to that physician, Dr. Louis Cohen, who questioned and examined him between "one and two P. M.," on the same afternoon, and who found him "quite pale, drenched with perspiration," in distress from pain in his chest, with low pulse, in semi-shock but "able to answer questions," Balash said that "when at work, while lifting some heavy object, cloth or something" (the words are Dr. Cohen's), he had suffered "severe pain in the chest," left shoulder, and down his arm, and to his back. Respondent cites the cases of *Tracey* v. *South River Lumber Co.*, 129 *N. J. L.* 546; 30 *Atl. Rep.* (2d) 412, and, with greater stress, *Schlegel* v. *H. Baron & Co.*, 130 *N. J. L.* 611; 34 *Atl. Rep.* (2d) 132—both chiefly fact cases like this, and each distinguishable from this.

In the first mentioned case, the claimant said that he had suffered a heart injury while loading a truck with lumber in the afternoon. It was established that it was no part of his duty to handle lumber, but that there was no truck in the afternoon on which he could have loaded it; his testimony is said to have been vague and very unsatisfactory; it was clearly overborne by the great weight of the evidence.

In the Schlegel case—concededly a coronary thrombosis case—the petitioner tardily attributed his disability to his having been struck violently in his chest by a falling case weighing, with its contents, sixty-two pounds, and testified that he lay helpless upon the case for three or four minutes until his assistant came to his aid. But he did not mention either to his assistant or to the general manager, whom he met on his way to a chemist, who gave him carbonate of soda, or to the superintendent, or to the physician who examined and treated him, his alleged accident. The latter, quickly

diagnosing the case as a coronary thrombosis, expressly inquired of him what he had been doing when seized by pain, and the petitioner expressly denied that he had been lifting anything or that he had been struck by anything at the time. He was under the care of the physician for the following three weeks, and concededly never told him of the alleged accident or mentioned it to the manager when the latter visited him at the hospital.

"It is inconceivable," wrote Mr. Justice Heher in the opinion delivered for the Supreme Court, "that claimant would have failed to inform his attending physician of the accident, if one had occurred, on the occasion of the examination and treatment shortly after the attack, and during the three weeks he was under his care at the hospital. The least informed know that the attending physician's resquest for the history, to aid in diagnosis and treatment, calls for the fullest disclosure in the patient's own vital interest. Normal human reactions and behavior are elements to be considered in the appraisement of such evidence."

In the present case, Dr. Cohen immediately drew from the patient the very history which Balash related in the Bureau. The history was not invented as an afterthought and an expedient. In the Schlegel case the forcible blow from the falling box was everything or nothing. If it happened as the claimant ultimately described it, his silence for weeks about it is unaccountable.

But in the ordinary sense of the term, Balash had no "accident." He neither stumbled nor fell, nor collapsed, as Schlegel at length claimed for himself, when unexpectedly struck by an external object. The sense and symptoms of disorder came upon Balash while engaged in routine and commonplace work—work which he had done daily for at least seven years, and many times a day; and it was scarcely to be held against him that he failed to attribute his attack to an everyday act of exertion, when certain learned men, respectable or eminent in their profession, still solemnly deny any causal relation between muscular strain or physical effort and coronary occlusion.

It is clear that his foreman, once aware of the man's ill-

ness, hurried him off to a nurse; and the nurse, to whose attention he came, appears to have decided intuitively that she was dealing with a case of sickness, not of accident. To the question, "Did you ask him specifically just what he had done before he got this pain across the chest?" her answer was in the negative: "That is up to the foreman. I did not ask him that question; that is up to the foreman." Having given a distinct answer and her reason for it, she inconsistently said a moment or two later that she had asked him. But when pressed and searched on the matter, when expressly asked three or four times again whether she had asked him what he was doing when he felt pain, her first answer was unresponsive, if not purposely evasive, and her subsequent reply was, "I don't know how to answer that question." The recollection of both nurses was, at least, mistaken in part. Both said Balash was accompanied by two men, the senior nurse saying that the foreman was one of them. The established fact is that only Ruttger brought Balash to the hospital.

A pertinent case, we think, is *General Cable Corp.* v. *Levins,* 122 *N. J. L.* 383; 5 *Atl. Rep.* (2d) 731; *affirmed;* 124 *N. J. L.* 223; 11 *Atl. Rep.* (2d) 61. Levins, while at work for his employer, struck his head on a beam, and everything got black. When his sight returned, he finished his work, but felt there was something in his eye. The plant physician removed a foreign substance from his eye. The workman later consulted an eye specialist, who operated without effecting a substantial cure. Mr. Justice Perskie, speaking for the Supreme Court, said: "Nor does the fact, under the proofs of the case at bar, that respondent said nothing to prosecutor's physician about the bump he received on his head operate to defeat his right to compensation for an injury he received arising out of and in the course of his employment. There is nothing to indicate, and no such claim is made, that he deliberately withheld such information. There is no reason why he should have withheld it save as he explains by saying that he didn't 'think of it.' When respondent was asked by his own physician whether he had received a blow on his head, he freely admitted it, and the cause of the retinal detachments became obvious. Had prosecutor's phy-

sician made the same inquiry, the same result would have or should have followed."

About two weeks before the last day of August, or at some time late in the month of July, Balash, as has been already noticed, complained of stomach disorder and an ensuing headache occurring in the middle of the afternoon, or still closer to four-thirty. Balash laid down, at the suggestion of the foreman, and rested for the remainder of the afternoon. The foreman said that Balash complained, at about nine o'clock on the morning of August 31st, of pain in his back. Nothing appears to have been said about any pain in any other area of his body. In this instance Balash did not rest, but persevered in his work with no further complaint. For his lunch he had, in the superheated room, two boiled eggs, a roll, and a cup of coffee; and resuming his work, as he testified, at half past twelve, he marked the ticket, raised the folded cloth to his shoulder, and was stricken before he had placed the goods upon the truck. There is a confused story in the record of his having vomited at one time or another. He said this happened in the yard after he left the clinic. Ruttger, who, after having conducted Balash to the nurse and was told by her that Balash was "a very sick man and was to go home," went back to the examiner's work room for Balash's scissors, hat and coat, and testified, "The nurse told me that when I came back with his coat and scissors, the nurse told me he had vomited." The nurse testified that Balash did not vomit in the hospital, and said that he told her he had not been feeling well over the "week end," or during the morning of August 31st—"He was vomiting upstairs;" "he informed me he was eating egg sandwich in the morning, felt sick after." There is no other sign in the record that he had vomited "upsairs." Curiously enough, the junior nurse, who walked with Balash from the hospital to the employment office, testified that she inquired of him on their way: "I asked him if he had any vomiting before and he said 'over the week-end I had not been feeling well at all,'" and added that while questioned by the senior nurse, "He specifically was emphatic about feeling sick after eating egg sandwich." We suppose it was the nurse, and not the badly

stricken man, who was "emphatic." Neither nurse asked him any particulars about his having been unwell "over the week-end" or to what he attributed it; and there is an air about the testimony of both not quite satisfactory.

There is medical testimony that symptoms of indigestion may mean indigestion, or may be mistaken for indigestion and signify "a coronary insufficiency," and that, as one of the respondent's doctors, Dr. Jerome Kaufman, testified, "an act of lifting or strain may precipitate a coronary thrombosis."

To the same effect was the testimony of Dr. Kleiner and the report of Dr. Boss.

As was stated by the deputy commissioner who heard the proceeding in the Workmen's Compensation Bureau, Dr. Kaufman testified that the act of exertion which the petitioner said he underwent was sufficient to hasten an attack of coronary thrombosis, even in a man who already had premonitory symptoms of a heart attack. The degree of exertion is of no consequence so long as the performance of the required work caused a strain upon the heart. *Molner* v. *American Smelting and Refining Co., supra.*

There is no substantial disagreement about the percentage of the claimant's disability. On the whole, we concur with the deputy commissioner, who had advantages for weighing the credibility of the witnesses which we do not share, that the weight of the evidence predominates in favor of the petitioner, and the judgment in his favor is affirmed.